IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:20-81 (WOB-EBA)

JAMES CHRISTOPHER CRIDER                                PLAINTIFF

VS.                 MEMORANDUM OPINION AND ORDER

LUTE SUPPLY, INC., ET AL.                              DEFENDANTS

The Court has reviewed the record anew, and concludes that defendant's motion for summary judgment, which the Court previously denied, should have been granted as there are no genuine disputes of material fact and defendants are entitled to judgment as a matter of law.

The Court therefore issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

A.  **Plaintiff is Hired by Lute.**

Plaintiff was hired as the Branch Manager of defendant Lute Supply, Inc.'s Cincinnati location in October of 2019. (Crider Dep., Doc. 24-1 at 28, 31). Lute is a plumbing supply company with locations in Ohio, Kentucky, and West Virginia. (Doc. 24-2 at 61).

As Branch Manager, Plaintiff was responsible for the daily operations of the Cincinnati location: opening the office each

morning in time to be ready for customers when the branch opened at 7:30 a.m.; assisting customers, who were typically contractors; managing phone and electronic orders; managing branch employees and warehouse personnel; and managing inventory and equipment. (Crider Dep. at 33-34, 37; Ankrom Dep., Doc. 25-1 at 11). Plaintiff was assisted in some of these duties by an Assistant Branch Manager. (Crider Dep. at 34; Ankrom Dep. at 12).

Plaintiff's regular work hours were 7:30 a.m. to 5:00 p.m., and he was expected to be physically present to open the branch in the morning. (Doc. 24-2, ¶ 2; Crider Dep. at 61-62). Plaintiff reported to Lute's Operations Manager, defendant Seth Ankrom, who was based at Lute's corporate headquarters in Portsmouth, Ohio. (Ankrom Dep., Doc. 25-1 at 8). During plaintiff's tenure at Lute, the branch was short-staffed. (Ankrom Dep. at 15).[1]

    B.    **Plaintiff's Jury Duty Notices and Request for Temporary Schedule Change.**

In February of 2020, plaintiff received a letter from the Boone County Circuit Court stating that plaintiff was being called for jury duty and that he was required to attend an orientation on March 27, 2020. (Doc. 24-2 at 78-79; Crider Dep. at 69). By email dated February 24, 2020, Crider sent a copy of this letter and his

---

[1] Ankrom testified that since most of Lute's customers are contractors, efficient service is particularly important because contractors work on billable hours and need to place their orders quickly and return to their jobs. (Ankrom Dep. at 58-59).

2

juror summons to Ankrom and Human Resources. (Doc. 24-2 at 80-82). Stephanie Neu, Lute's Human Resources Manager, responded the next day, noting that she had placed the information in Plaintiff's file and explaining that he should turn in his jury duty checks so that he could be paid in full for any days he missed due to jury service. (Doc. 24-2 at 83; Crider Dep. at 43-44).

On March 17, 2020, Plaintiff emailed Ankrom and Human Resources to tell them that he had a personal traffic court date on March 23, 2020 and also to remind them of his jury orientation on March 27 at 1:00 p.m.. (Doc. 24-2 at 86). As to the latter, he said, "I will be in the office that morning on that date but will be leaving early." (*Id.*).

Neu responded shortly thereafter, "Are you positive that these are still in session? You might want to double check." (*Id.*). Plaintiff understood her to be asking "if my court would still be in session due to the pandemic having everything closed down," and not that she was saying that he could not go to court. (Crider Dep. 86).[2]

Sometime between March 17 and March 27, Plaintiff received a letter from the Boone County Circuit Court advising him that his jury orientation on March 27 had been rescheduled to April 17, 2020. (Doc. 24-2 at 85; Crider Dep. at 81, 98-99). Nonetheless,

---

[2] Plaintiff's traffic court date was later rescheduled to May 18, 2020. (Doc. 24-2 at 90-91; Crider Dep. at 93).

3

and despite having told Lute that he would be at work on the morning of March 27, Plaintiff did not report to work to open the branch that morning. (Ankrom Dep. at 29). Around 9:00 a.m., Ankrom texted Plaintiff: "Where are you? Eclipse[3] says off for jury duty but courts are closed." (Doc. 25-2 at 20). At 11:41 a.m., Plaintiff texted back, "I have to report to the court house today." (*Id.*). Ankrom responded, "Ok, hr said courts are closed." (*Id.*). Plaintiff replied, "They aren't holding criminal court. They are holding civil and family courts. I have to report and I'm sure they will reschedule it but legally im [*sic*] required to report or they issue a warrant for my arrest." (*Id.* at 21). Ankrom took Plaintiff at his word and did not write him up for missing work that day.[4]

On April 8, 2020, Plaintiff sent an email to Human Resources with a copy of the Boone County Circuit Court letter rescheduling his jury orientation to April 17, 2020. (Doc. 24-2 at 87-89).

The same day, Plaintiff sent an email to Ankrom and Human Resources requesting that his schedule be temporarily adjusted so that he could take care of his children in the afternoon during their school's closure due to the pandemic. (Crider Dep. at 44-

---

[3] Eclipse appears to be Lute's personnel software. (Doc. 25-2 at 57-58).

[4] Plaintiff testified that when he got to the courthouse, most likely around 12:30 p.m., he was told that the jury orientation was cancelled; that he was probably there for about 15 minutes; and that he could not recall where he went afterwards. (Crider. Dep. at 96-97).

4

47, Doc. 24-2 at 74-77). The email was titled "Temporary Work Schedule Change." (Doc. 24-2 at 77). Crider requested that he be permitted to leave at 3:30 p.m. instead of 5:00 p.m. and to work the remainder of the day from home for a period of two weeks. (*Id.*). Plaintiff did not request a change to his 7:30 a.m. starting time. (Crider Dep. at 51-52). And he only asked for this change for two weeks because he had arranged for his girlfriend and mother to watch his children in the afternoons beginning on April 20, 2020.

Ankrom responded that he needed clarification about this request, noting that, "It is critical for the success of the company that Branch managers are in the store during normal business hours. You need to lead from the front and be available whenever unplanned issues arise to have success as a Branch Manager." (Doc. 24-2 at 76). Plaintiff replied, explaining his reasons for his request, including his mother's poor health, and stated: "I absolutely do not want to take leave during these times because it is crucial [I] am here as much as possible to run the day to day operations of the branch . . . ." (*Id.*).

Ankrom responded:

> I reviewed our texts and messages since January and *your late arrivals and early departures have been frequent in the time before the pandemic for various reasons.* These instances send a negative message to your team.

5

> *All things considered, I am going to approve your request for the dates you asked about.* This will create added stress to your staff and likely lead to other issues as well. To help alleviate that you need to make sure everyone there knows and understands your situation. *You will need to be in the building on time* and out on the counter or warehouse leading from the front everyday. . . *You will also need to answer messages and JQ's in a timely manner and make sure to have your company cell phone with you to answer calls, texts and emails you might receive after you leave.*

(Doc. 24-2 at 75) (emphasis added).

During these two weeks when Plaintiff was allowed to leave the branch at 3:30 p.m., he continued to field work calls and respond to emails and text messages between 3:30 and 5:00 p.m. (Crider Dep. at 63-65). He was also paid his full salary for those two weeks. (*Id.*).

C. **April 17, 2020.**

Having received no further correspondence from the Boone Circuit Court before his April 17, 2020 jury orientation date, Plaintiff believed he was obligated to report that day at 1:00 p.m. (Crider Dep. 107, 114). Importantly, however, he did not report to work at 7:30 that morning to open the branch. In his deposition, he testified that was because he "was trying to prepare for my jury duty" and because he was "taking care of my children that morning." (Crider Dep. at 120-21). He also testified that there was no reason, "other than taking care of my kids," that he

6

could not have opened the branch at 7:30 a.m. and still reported for jury duty at 1:00 p.m. (Crider Dep. at 121, 131, 148).

Instead of going to work, Plaintiff drove to the Boone County Courthouse and was there when they opened at 8:30 a.m. "to find out if jury duty had been cancelled." (Crider Dep. at 116, 119). A woman at the courthouse told him that she did not know if it was cancelled. (Crider Dep. at 117-119).

At 8:52 a.m., Ankrom texted Plaintiff, "Where are you?" (Doc. 25-2 at 31). Plaintiff wrote back: "I am off today because today is the date my jury duty was rescheduled to." (*Id.*). Ankrom asked Plaintiff what time he was due to report, and Plaintiff responded 1:00 p.m. (Doc. 25-2 at 32). And, although he was already at the courthouse, Plaintiff stated: "I am on my way there now to find out if they are actually doing it or not." (*Id.*).

Ankrom then told Plaintiff that the jury orientation had been cancelled and rescheduled to June, and Ankrom gave Plaintiff the courthouse number where he could call to confirm that information. (*Id.*).[5] Plaintiff did not call the number, however; in his deposition he testified he did not do so because "I was already on

---

[5] That morning, Neu had called the Boone County Circuit Court, and a court employee emailed her a copy of the letter that notified jurors of the rescheduling of the April 17 date; the employee noted in her email that the orientation was subsequently rescheduled to June 1, 2020. (Doc. 24-2 at 122-23; Neu Depo. at 33; Neu Affidavit, Doc. 27-1). Neu relayed this information and the court's phone number to Ankrom. (Ankrom Dep. at 53).

7

my way to the courthouse" and "I believe at that point I may have already made it to the courthouse." (Crider Dep. at 128).

Instead, Plaintiff texted Ankrom: "Ok. So if I do not show up to the courthouse like I am legally obligated to do and a warrant gets issued for my arrest or I am found to be in contempt of court for not appearing is lute [*sic*] willing to hold my job while I fight the legal process." (Doc. 25-2 at 32). Ankrom then explained that the court had sent out letters two weeks before rescheduling the dates, but Plaintiff denied receiving them. (Doc. 25-2 at 33). Ankrom then texted, "Call the number and let me know what they say." (*Id.*). He then reiterated the importance of Plaintiff being physically present at the branch; that he could easily have opened the branch at 7:30 a.m. and still reported to the court by 1:00 p.m.; and that given the COVID situation, he should have called the court to see if he still needed to report. (Doc. 25-2 at 34).

Plaintiff continued to argue about being "potentially incarcerated" for not reporting, and he gave no explanation why he did not open the branch at 7:30 a.m. when he believed he was not required to report to court until 1:00 p.m. (Doc. 25-2 at 35-39). After further exchanges in this vein, Ankrom stated: "We have reached a point where you are not understanding or meeting expectations as communicated. Your employment is terminated. Please turn in all company owned property to Curtis or Adam by the end of the day." (Doc. 25-2 at 41).

8

The Termination Report reflecting Plaintiff's dismissal lists as the reason his failure to meet attendance expectations, noting: "When attendance and performance issues were addressed the employee argued and had no ability to process or take direction for improvement." (Doc. 25-2 at 44).

**D.   This Lawsuit**

Plaintiff filed a complaint in Boone County Circuit Court on May 7, 2020 against Lute and Ankrom, alleging three causes of action: (1) violation of KRS § 29A.160; (2) violation of the Emergency Family Medical Leave Expansion Act; and (3) violation of the Emergency Paid Sick Leave Act. (Doc. 1-2). Defendants removed the action to this Court on June 2, 2020. (Doc. 1).

Defendants moved for summary judgment (Doc. 26) and, after oral argument, the Court denied that motion and set the matter for trial. (Docs. 42, 46). Having now reviewed the record again, the Court concludes that its ruling was in error and that defendants are entitled to summary judgment.

*Analysis*

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, the Court must view all

9

relevant facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Lanman v. Hinson*, 529 F.3d 673, 679 (6th Cir. 2008).

### A. **KRS § 29A.160**

Plaintiff's first claim arises under KRS § 29A.160, which states:

> An employer shall not deprive an employee of his employment, or threaten or otherwise coerce him with respect thereto, because the employee receives a summons, responds thereto, serves as a juror, or attends court for prospective jury service.

KRS § 29A.160(a).

The parties disagree about what analytical framework applies to this claim. Plaintiff advocates for the familiar burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), citing its application by the Supreme Court of Kentucky in *Kentucky Dep't of Corrs. v. McCullough*, 123 S.W.3d 130 (Ky. 2003). Defendants instead argue that a "but for" causation test applies, relying *Asbury Univ. Powell*, 486 S.W.3d 246 (Ky. 2016).

Those cases, however, address the anti-retaliation portion of the Kentucky Civil Rights Act, rather than KRS § 29A.160, and there is a remarkable dearth of authority on the latter.

10

Nonetheless, the Court need not decide which test applies because it concludes that plaintiff cannot raise a triable issue under either one.

The record is clear that, when plaintiff first notified Lute that he had been summoned for jury service, Human Resources told him that he would be paid his full salary for any days he was required to miss for such service. Further, when plaintiff failed to report for work at all on March 27, 2020—despite having assured Lute that he would still open the branch at 7:30 a.m.—Ankrom took plaintiff at his word that he was legally required to report and did not discipline him for the absence.

However, Ankrom subsequently reiterated to Plaintiff the importance of being physically present at the branch in order to be a leader to his team and oversee operations.

Nonetheless, on April 17, 2020, Plaintiff again failed to report to work at 7:30 a.m., even though the jury orientation he believed he was obligated to attend did not start until 1:00 p.m. When Ankrom texted Plaintiff to find out where he was and explained that he (Ankrom) had learned that the orientation had been rescheduled, Plaintiff not only refused to take the simple step of telephoning the court to confirm that fact, he also offered no colorable reason why he had failed to open the branch at 7:30 a.m. Instead, Plaintiff adopted what may fairly be characterized as a

11

belligerent tone with his boss, continuing to argue in response to Ankrom's questions.

Indeed, even in his deposition, Plaintiff could offer no explanation why he could not have fulfilled his duty to open the branch that morning and still report to what he believed was the scheduled court proceeding at 1:00 p.m. (Crider Dep. at 131).

Plaintiff argues that his termination was precipitous and thus pretextual because he was a good employee with a "spotless" employment file. Plaintiff misstates the record. While he had no written reprimands, the record is clear that Ankrom had raised concerns with Plaintiff regarding his attendance and stressed the importance of Plaintiff being present at the branch to "lead from the front." (Doc. 24-2 at 75-76). Plaintiff conceded this in his deposition. (Crider Dep. at 61-62). And, of course, Plaintiff had only been working at Lute for approximately six months.

Plaintiff also labels as suspicious Lute's failure to discipline him for his absence on March 27, 2020, when he failed to come to work in the morning in advance of jury service that afternoon. Putting aside the "no good deed goes unpunished" aspect of this argument, it ignores Ankrom's testimony that he simply accepted Plaintiff's explanation that he had to report to court that day to confirm whether his presence was required. Surely if Lute harbored animus based on an employee's absence due to jury service, it would have taken adverse action against Plaintiff then.

12

In short, the record contains no evidence from which a jury could reasonably infer that Plaintiff's protected activity related to his jury service was the reason that Lute fired him, rather than his abandonment of his job duties on the morning of April 17, 2020.

Defendants are thus entitled to summary judgment on this claim.

**B.** **Emergency Family and Medical Leave Expansion Act and Emergency Paid Leave Sick Act.**

Congress passed the Families First Coronavirus Response Act (FFCRA) in response to COVID-19. *Bowden v. Brinly-Hardy Co.*, No. 3:20-CV-0438-CHB, 2020 WL 9607025, at *3 (W.D. Ky Dec. 15, 2020). The two relevant provisions of this Act for purposes of this case are the EFMLEA and the EPSLA. Families First Coronavirus Response Act, 116 P.L. 127, §3101, 5101.

The EFMLEA temporarily amended the Family and Medical Leave Act (FMLA) to allow employees to take leave if they are "unable to work (or telework) due to a need . . . to care for [a] son or daughter under 18 years of age." *Id*. at §3102(b). Similarly, the EPSLA allows an employee up to 80 hours of paid sick leave if they are caring for their child whose school has been closed. EPSLA at §5102(a)(5).

Claims for retaliation under the EFMLEA and the EPSLA are analyzed under the *McDonnel-Douglas* burden shifting framework.

13

*Atwood v. JCF Residences Mgmt. Co.*, Case No. 1:20-cv-00056, 2022 WL 185187, at *5, *8 (M.D. Tenn. Jan. 19, 2022).

The parties dispute whether the temporary change in Plaintiff's work schedule in April 2020 qualifies as "leave" that triggers protection under these statutes. The Court need not decide this issue, however, because these claims fail for the reasons already discussed: there is no evidence from which a reasonable jury could infer that defendants' reason for firing Plaintiff was a pretext for retaliation, whether for his jury service or the two-week adjustment in his work schedule.

In fact, Ankrom granted Plaintiff's request for that adjustment the same day Plaintiff requested it. And Plaintiff testified in his deposition that no one had told him that his child care arrangements were unacceptable. (Crider Dep. at 155). He also agreed with Ankrom's statement that Lute had accommodated every request that Plaintiff had made in regard to being flexible with attendance. (*Id.*).

There is simply no genuine despite of material fact on these claims, even viewing the evidence in Plaintiff's favor.

Therefore, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that:

14

(1) The Court's order denying defendants' motion for summary judgment (Doc. 42) be, and is hereby, **VACATED**;

(2) Defendants' motion for summary judgment (Doc. 26) be, and is hereby, **REINSTATED AND GRANTED**; and

(3) A judgment shall enter concurrently herewith.

This 11th day of March 2022.



Signed By:
<u>William O. Bertelsman</u> WOB
United States District Judge